151 So.2d 315 (1963)
CONFEDERATION LIFE ASSOCIATION, a Canadian corporation, also known as La Confederacion Del Canada, Appellant,
v.
Leandro Goiricelaya UGALDE, Appellee.
No. 62-295.
District Court of Appeal of Florida. Third District.
March 26, 1963.
Rehearing Denied April 11, 1963.
*316 Shutts, Bowen, Simmons, Prevatt & Boureau and Cotton Howell, Miami, John G. Laylin, Washington, D.C., for appellant.
Nestor Morales, Miami, for appellee.
Before PEARSON, TILLMAN, C.J., and CARROLL and HORTON, JJ.
CARROLL, Judge.
This is an appeal by the defendant below from an adverse summary judgment. Appellant, a Canadian corporation, had issued a $20,000 life insurance policy to a resident of Havana, Cuba, in 1948. Some thirteen years later, when requested to pay the cash surrender value, the company offered to pay in Cuban pesos in Havana, but refused to pay in United States dollars. The insured sued the company in Dade County, Florida. Both parties moved for summary judgment. Plaintiff's motion was not augmented by evidentiary matter. Defendant's motion was supported by an affidavit of an expert to the effect that under Cuban law the defendant was authorized and required to pay the obligation in Cuban currency legal tender. Summary judgment was entered against the defendant for $13,825.52,[1] plus certain costs.
The determinative question in the trial court as on this appeal was whether the defendant's obligation under the insurance policy to pay the cash surrender value, at the time demanded, was to be measured in United States dollars, or, as the defendant contended, in Cuban pesos.[2]
The material facts as disclosed by the pleadings were not in dispute. The application for the life insurance policy was made by the appellee in 1948 in Cuba. Both in the application and in the policy which was written in Spanish it was stated that the policy would become effective upon payment of the first premium. The insured received delivery and paid the first premium in Havana. The policy provided that all payments were to be made in United States dollars, and the place for making payments under the policy was specified to be Havana, Cuba.
Subsequent to the issuance of the insurance policy, the Cuban government made certain laws and decrees which removed United States dollars as legal tender and substituted the Cuban currency of legal tender, for discharge of obligations payable in Cuba. Cuban Law No. 13 of December 23, 1948, provided that beginning one year after the Banco Nacional de Cuba should commence operations the currency of the United States of America would cease to be legal tender and to have debt redeeming *317 force in Cuba. The Bank began its operations on April 27, 1950. The one year grace period previously imposed, which would have ended April 26, 1951, was extended to June 30, 1951, by an executive order, Decree No. 1384 of April 19, 1951. That decree provided that after the end of such extended grace period obligations could be discharged in Cuban currency regardless of contract provisions for payment in United States dollars. The provisions of Decree No. 1384 pertinent to that feature were as follows:
"Second. Beginning on the date on which the United States currency shall cease to be legal tender and have debt redeeming force in the territory of the Nation, all obligations contracted or payable in the national territory shall be expressed and settled in national currency pursuant to the provisions of Law No. 13, of December 23, 1948, subject to no exception other than those specified in Articles 96, 98 and 113 thereof.
"The debtors of obligations not included in said exceptions and the payment whereof in United States currency has been stipulated or agreed upon prior to the cessation of such legal tender status and such debt redeeming force, may settle such obligations at par through the delivery of national currency in the same amounts as those previously expressed in United States dollars."
Thereupon the company notified its policy holders in Cuba that under said Decree No. 1384 amounts theretofore provided to be payable in United States dollars would be paid "in Cuban pesos one for one." The plaintiff made subsequent premium payments in Cuban pesos, and the company accepted them at par with the dollar as it was required to do by the Cuban law.
On October 2, 1959, the government of Cuba, under the rule of the dictatorship of Fidel Castro, enacted Law No. 568, which forbade the export of currency or transfer of funds abroad except for cases authorized by the Currency Stabilization Fund of Cuba. Unauthorized transfers were made felonies and it was provided that companies which are "presumed to have infringed the provisions of this law" may be "intervened." Thereafter, on February 23, 1961, the Cuban government enacted Law No. 930, which provided that the Banco Nacional de Cuba should regulate the issuance of currency, and such currency (Cuban pesos) was to be the only legal tender and was to be accepted in payment of any obligation payable in Cuba, and further provided that obligations which by agreement were made payable in another currency must be settled and paid in Cuban legal tender. The demand for payment of the cash surrender value was made October 11, 1961, after enactment of the laws referred to above. The complaint in this suit was filed November 3, 1961.
The appellant contends that the contract is controlled by Cuban law, and that payments thereunder may and in fact must be with Cuban pesos at par with the dollar.
Appellee argues that the contract is governed by the law of Florida, and that it would be against the public policy of the State of Florida to recognize and enforce in behalf of the defendant insurance company the right, as conferred by Cuban law, to discharge the obligation in pesos.
The policy did not specify the law of any particular jurisdiction to govern it. The contract was made in Cuba[3] and by its terms was to be performed there.[4] Neither *318 Florida nor any jurisdiction other than Cuba had any significant contacts with regard to the obligations of the insurance policy so as to justify or require the contract to be governed by the law of Florida or such other jurisdiction.[5] Under the above conditions, it is held uniformly, and in Florida, that when the place of the making and the place of the performance are the same, the law of that jurisdiction determines and controls the validity, interpretation, and the rights and obligations under such a contract. Thomson v. Kyle, 39 Fla. 582, 23 So. 12, 16; Connor v. Elliott, 79 Fla. 513, 85 So. 164, cert. den. 254 U.S. 665, 41 S.Ct. 148, 65 L.Ed. 465 (1920); Brown v. Case, 80 Fla. 703, 86 So. 684; In the Matter of Magnus Harmonica Corporation, 3 Cir., 1959, 262 F.2d 515, 518, note 8; Annot., 50 A.L.R.2d 254, 257; 11 Am.Jur., Conflict of Laws, § 117, p. 401; Restatement, Conflict of Laws, §§ 346, 358.
When a suit is brought on a contract in a jurisdiction other than the one which governs the rights and obligations thereunder, a defense lawfully vested under the law of the latter jurisdiction may not be ignored by the forum if that state had no significant connection with the contract obligations. Rejection of such rights under the contract, asserted as a defense, is a deprivation of due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States and Section 12 of the Declaration of Rights of Florida, F.S.A. Home Ins. Co. v. Dick, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926, 74 A.L.R. 701 (1930); Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178, 92 A.L.R. 928 (1934); Holderness v. Hamilton Fire Ins. Co. of New York, S.D.Fla. 1944, 54 F. Supp. 145. Compare Clay v. Sun Insurance Office Ltd., 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170, (1960), vacating and remanding, 5 Cir., 1959, 265 F.2d 522, on holding the constitutional issue to have been decided prematurely. In Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., supra, a suretyship contract, held to have been governed by the laws of Tennessee, was sued upon. The Mississippi court refused to give effect to a provision of the contract, valid under the law of Tennessee, which absolved the defendant insurance company from liability. In reversing a judgment for the plaintiff, the Supreme Court of the United States said:
"The contract being a Tennessee contract and lawful in that state, could Mississippi, without deprivation of due process, enlarge the appellant's obligations by reason of the state's alleged interest in the transaction? We think not. Conceding that ordinarily a state may prohibit performance within its borders even of a contract validly made elsewhere, if the performance would violate its laws (Home Insurance Company v. Dick, supra, page 408 of 281 U.S., 50 S.Ct. 338, 74 L.Ed. 926 [933], 74 A.L.R. 701), it may not, on grounds of policy, ignore a right which has lawfully vested elsewhere, if, as here, the interest of the forum has but slight connection with the substance of the contract obligations. * * *"
In the instant case, the defendant asserted as a defense its right to pay in Cuban pesos at par and the obligation of the insured to accept payment in such form, as provided for in the insurance contract as modified by the laws and executive decrees of Cuba. The trial court rejected the defense. In so doing, the trial court erred and deprived appellant of due process of law.
As a sovereign nation, Cuba was entitled to establish a national currency and require its use in discharge of obligations governed by its law. Guaranty Trust *319 Co. of New York v. Henwood, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266 (1939). And Cuba had the power to declare that which was legal tender for the discharge of such obligations. Legal tender cases, Knox v. Lee and Parker v. Davis, 79 U.S. (12 Wall.) 457, 20 L.Ed. 287 (1870); Juilliard v. Greenman, 110 U.S. 421, 448, 4 S.Ct. 122, 130, 28 L.Ed. 204, 214 (1884). That power could be exercised by Cuba in its sovereign capacity even though to do so altered the terms and impaired the obligations of such contracts theretofore made. Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352 (1935); Guaranty Trust Co. of New York v. Henwood, supra. First, the Cuban government in furtherance of its fiscal policy was entitled to and did make laws relating to its currency and legal tender which effectively changed the contract from one payable in dollars to one payable in Cuban legal tender at one unit (peso) per dollar. Second, as a result thereof, under the terms of the insurance contract as so altered, the obligation of the defendant insurance company to pay the cash surrender value under the policy became an obligation to pay in Cuban legal tender.
In Guaranty Trust Co. of New York v. Henwood, supra, there was involved a question of whether obligations due under certain railroad company bonds could be required to be paid in guilders (amounting to $37,335,525.12) or in then current United States dollars ($21,638,000.00). The bonds, made in this country, covenanted for payment to be made in the United States in dollars, or in certain other countries in their currency at designated rates of exchange, including in Holland at 2,490 Holland guilders per $1,000.00. Although payment was made permissible in other places as well as in the United States and in other currencies as well as in dollars, there were other provisions, for mortgage trustees to have their office in the United States and for performance of their duties here, which, coupled with the provision for payment here, prompted the United States Supreme Court to hold that "Both the mortgage and bonds are domestic obligations and the law of this country must determine their interpretation, their nature, and the obligations enforceable under them." 59 S.Ct. 851, 83 L.Ed. 1274. The court then held that the obligations were within the scope of those encompassed by the Joint Congressional Resolution of June 5, 1933, which altered the bond contracts to make them payable in United States legal tender (devalued dollars) for which it provided. And the court in that case also rejected the argument that such impairment of the bond contracts was a taking of property in violation of constitutional guarantees. As to that, the court said (59 S.Ct. 853-854, 83 L.Ed. 1276-1277):
"There remains the argument of petitioners that the Resolution, if construed to forbid enforcement of the option to demand payment in guilders, nullifies contractual rights in violation of the Fifth Amendment to the Constitution, U.S.C.A. But, as has already been pointed out, the contracts on which the claims for guilders rest are domestic obligations, controlled by and to be interpreted under the law of the United States. And contracts between private parties cannot create vested rights which serve to restrict and limit an exercise of a constitutional power of Congress. These bonds and their securing mortgage were created subject not only to the exercise by Congress of its constitutional power `to coin Money, regulate the Value thereof, and of foreign Coin,' * * * but also to `the full authority of the Congress in relation to the currency.' The extent of that authority of Congress has been recently pointed out: * * * [in Norman v. Baltimore & Ohio R. Co., supra].
"Under these powers, Congress was authorized  as it did in the Resolution  to establish, regulate and control the national currency and to make that currency legal tender money for all purposes, including payment of domestic *320 dollar obligations with options for payment in foreign currencies. Whether it was `wise and expedient' to do so was, under the Constitution, a determination to be made by the Congress. The Resolution that made these creditors' bonds dischargeable in the same United States legal tender which other creditors in this country must accept, does not contravene the Fifth Amendment."
The decision of the United States Supreme Court in the case of Norman v. Baltimore & Ohio R. Co., supra, upheld the inherent power of a national government over its monetary system, and approved legislation which provided that obligations could be discharged by prescribed legal tender of less value than that called for in certain existing government and private contract obligations. Also, the court in that case recognized such action was taken for the express purpose of permitting debts to be paid with devalued money, and that such purpose together with other purposes such as for uniformity in currency, represented policies of the government which were not inappropriate. It was expressly held in that case that clauses of contracts calling for payment in money of greater value than the Congress thus provided for could not operate to frustrate that inherent power of the sovereign.
At the outset the Supreme Court of the United States announced that the case presented the "question of the validity of the Joint Resolution of the Congress, of June 5, 1933, with respect to the `gold clauses' of private contracts for the payment of money. 48 Stat. [at L.] 112." And the court then summarized the Resolution as it had reference to the question under examination, as follows:
"This resolution, the text of which is set forth in the margin, declares that `every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby' is `against public policy.' Such provisions in obligations thereafter incurred are prohibited. The resolution provides that `Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts.'"
The Supreme Court then held that the power of the United States government in relation to its currency did not depend on the express constitutional power "To coin Money, regulate the Value thereof, and of foreign Coin," but that the power to regulate its currency was derived from "all the related powers conferred upon the Congress and appropriate to achieve `the great objects for which the government was framed'  `a national government, with sovereign powers.'" Further, (55 S.Ct. at 415, 79 L.Ed. at 901) the court held: "The conclusion was that contracts must be understood as having been made in reference to the possible exercise of the rightful authority of the government, and that no obligation of a contract `can extend to the defeat' of that authority."
On the specific question of whether the federal government could invalidate provisions of existing contracts by permitting payment in a currency medium of less value than that expressly provided for in a contract, the Supreme Court of the United States in the Norman case upheld the power. The court made reference to a number of instances of governmental change, impairment and even abrogation of contracts, such as in the course of regulating commerce affecting shippers and carriers. It was held that the exercise of such powers was not limited to authority from specific power grants to Congress in the Constitution, and the court said: "There is no constitutional ground for denying to the Congress *321 the power expressly to prohibit and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of the policy it is free to adopt."
Moreover, the problem which prompted the government of the United States to provide for the discharge of "gold clause" contract obligations in currency or legal tender of lesser value, was shown in the Norman case to have been the result of devaluation of the dollar,  a similar situation to that presented in Cuba when the American dollar exceeded the value of the Cuban peso. In this regard it was said in the Norman case (55 S.Ct. at 419, 79 L.Ed. at 906):
"The devaluation of the dollar placed the domestic economy upon a new basis. In the currency as thus provided, states and municipalities must receive their taxes; railroads, their rates and fares; public utilities, their charges for services. The income out of which they must meet their obligations is determined by the new standard. Yet, according to the contentions before us, while that income is thus controlled by law, their indebtedness on their `gold bonds' must be met by an amount of currency determined by the former gold standard. Their receipts, in this view, would be fixed on one basis; their interest charges, and the principal of their obligations, on another. It is common knowledge that the bonds issued by these obligors have generally contained gold clauses, and presumably they account for a large part of the outstanding obligations of that sort. It is also common knowledge that a similar situation exists with respect to numerous industrial corporations that have issued their `gold bonds' and must now receive payments for their products in the existing currency. It requires no acute analysis or profound economic inquiry to disclose the dislocation of the domestic economy which would be caused by such a disparity of conditions in which, it is insisted, those debtors under gold clauses should be required to pay $1.69 in currency while respectively receiving their taxes, rates, charges, and prices on the basis of $1 of that currency."
When this country acted in 1933, as was the case in Cuba in 1948 (effective in 1951), the dollar had not been devalued but devaluation was in prospect, and similarly the Cuban peso was not then devalued but later became so in relation to the American dollar. Thus in the Norman case the court said: "It is true that, when the Joint Resolution was adopted on June 5, 1933, * * * the dollar had not yet been devalued. But devaluation was in prospect and a uniform currency was intended. * * * The weight of the gold dollar was not to be reduced by more than fifty percentum. * * The order of the President of January 31, 1934, fixed the weight of the gold dollar at 15 5/21 grains nine-tenths fine as against the former standard of 25 8/10 grains nine-tenths fine."
The argument that the Cuban government, in providing a uniform currency and making obligations of contracts payable there dischargeable in its designated legal tender, was taking action repugnant to the policy of this country, is wholly without merit. There is no Florida Statute defining a policy on which the court could deprive the defendant of its rights under the Cuban contract as such rights are fixed and determined under Cuban law. But even were there such a statute, its effectiveness would be open to question. See Home Insurance Co. v. Dick, supra; Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., supra; Clay v. Sun Insurance Office Ltd., supra; Holderness v. Hamilton Fire Insurance Co. of New York, supra. Not only is there an absence of any Florida law or policy against a sovereign nation prescribing its legal tender and making all obligations payable there dischargeable only therein, but the same process when employed by the United States government in 1933 was held by our Supreme Court to be *322 dictated by our government's policy favoring it.[6] This also is shown by the opinion in the Norman case, where the court, after discussing the devaluation of the dollar as outlined in the quotation appearing just above, said (55 S.Ct. at 419, 79 L.Ed. at 906): "If the gold clauses interfered with the congressional policy, and hence could be invalidated, there appears no constitutional objection to that action by the Congress in anticipation of the determination of the value of the currency."
With apology for unduly extending this opinion by extensive quotations from the Norman case, it is deemed sufficiently enlightening and authoritative on the problem presented in the instant case to quote the ending of the Norman opinion, in which the Supreme Court of United States repeated and summarized its holding that the national power to regulate currency and prescribe legal tender for payment of debts, in furtherance of policies respecting the monetary system, prevails over contrary contract clauses, which, otherwise, would operate to limit or deprive the sovereign of the exercise of that power. In this connection, in ending that important decision, the Supreme Court said:
"We are not concerned with consequences, in the sense that consequences, however serious, may excuse an invasion of constitutional right. We are concerned with the constitutional power of the Congress over the monetary system of the country and its attempted frustration. Exercising that power, the Congress has undertaken to establish a uniform currency, and parity between kinds of currency, and to make that currency, dollar for dollar, legal tender for the payment of debts. In the light of abundant experience, the Congress was entitled to choose such a uniform monetary system, and to reject a dual system, with respect to all obligations within the range of the exercise of its constitutional authority. The contention that these gold clauses are valid contracts and cannot be struck down proceeds upon the assumption that private parties, and states and municipalities, may make and enforce contracts which may limit that authority. Dismissing that untenable assumption, the facts must be faced. We think that it is clearly shown that these clauses interfere with the exertion of the power granted to the Congress, and certainly it is not established that the Congress arbitrarily or capriciously decided that such an interference existed."
We adopt that reasoning and apply it to this contract. Thus the government of Cuba was entitled to provide by law as it did in 1948 and later for a uniform currency, eliminating United States dollars as legal tender in Cuba, specifying its own currency legal tender and first authorizing then later requiring that obligations payable there be discharged in Cuban pesos at par, one for one with the dollar. This contract between a Cuban national and a Canadian company was indigenous to Cuba. Its provision for payments in United States dollars was eliminated by the sovereign and there were substituted contract provisions that United States dollars would not be legal tender for discharge of the obligations under the policy and that such obligations were payable in Cuban pesos at par. The insured availed himself of that right by paying premiums in Cuban pesos. No lawful basis has been disclosed on which the trial court could reject unliked terms of the *323 contract as modified by the Cuban currency laws or deny to the defendant its asserted right to meet its obligations under the policy in such pesos.
By cross assignment appellee contends the trial court should have allowed attorney fees under § 627.0127, Fla. Stat., F.S.A. The statute contains a proviso as follows:
"Except, that without any prejudice or effect whatsoever as to suits relating to other kinds of insurance, no such attorney fee shall be allowed in any such suit based on a claim arising under a life insurance policy or annuity contract if such suit was commenced prior to expiration of sixty days after proof of the claim was duly filed with the insurer."
The trial court was not in error in that matter. The proviso became applicable. Suit was filed in less than 60 days after demand for payment of cash surrender value.
It does not follow, however, that the trial court erred, as appellant contends, by refusing to dismiss the action. The courts of Florida were open to the Cuban citizen, while here, to seek redress for a wrong remediable in law, under Section 4 of the Declaration of Rights of Florida, F.S.A. The error was not in entertaining suit and granting the summary judgment for plaintiff, but in the amount of the judgment.
For the reasons stated, the judgment is affirmed in part and reversed in part, and the cause is remanded with directions to the circuit court to enter judgment for the plaintiff in United States dollars for such sum as shall represent and equal the value, based on the rate of exchange on the date of the original demand, of the 13,825.53 Cuban pesos with which under the contract as controlled by Cuban law the defendant insurance company was entitled and required to pay the demanded cash surrender value under the policy.
Affirmed in part, reversed in part, and remanded.
HORTON, Judge (concurring in part and dissenting in part).
I respectfully dissent from the opinion and conclusions reached by the majority in this case, except as to the denial of an award of attorney's fees.
In essence, the majority opinion delineates the facts and then states the well established rule that when the place of making and place of performance of a contract are the same, the law of that jurisdiction controls as to the validity, interpretation, rights and obligations thereunder, absent a significant contact with, or overriding considerations of, public policy at the forum. It further states that since the contract, and by this is meant the contract sued upon, was made and performable in Cuba and had no significant contacts with Florida or any other jurisdiction, Cuban law is controlling. As I read the majority opinion, the gold clause cases are not a part of the ratio decidendi but are merely cited and discussed to illustrate the untenability of the appellee's contention that the Cuban government, in providing a uniform currency and making obligations of contracts payable there dischargeable in its designated legal tender, was taking action repugnant to the public policy of the United States or Florida. In my opinion, the majority has stated the law correctly but erred in its application.
The provisions of a life insurance policy concerning payment of a cash surrender value constitute no more than a continuing irrevocable offer by the company, and no completed contract to pay such value exists unless and until this offer is accepted by the insured in accordance with its tenor and terms. Pacific States Life Ins. Co. v. Bryce, 67 F.2d 710, 91 A.L.R. 1446 (10 Cir., 1933); United States v. Garland, 122 F.2d 118, 136 A.L.R. 918 (4 Cir., 1941), cert. den. 314 U.S. 685, 62 S.Ct. 189, 86 L.Ed. 548; Roth v. *324 Kaptowsky, 393 Ill. 484, 63 N.E.2d 664 (1946); Gerber v. Equitable Life Assur. Soc. of United States, 1 Ill. App.2d 272, 117 N.E.2d 393 (1954); Langley v. New York Life Insurance Co., 273 S.W.2d 567 (Ky. 1954); Lauer v. Michigan Life Ins. Co., 268 Mich. 614, 256 N.W. 567 (1934); Mutual Life Ins. Co. v. Kaiser, 193 Miss. 581, 10 So.2d 766 (1942); Minning v. Prudential Ins. Co. of America, 88 Ohio App. 339, 95 N.E.2d 269 (1950); see also 29 Am.Jur., Insurance, § 631, p. 916; 45 C.J.S. Insurance § 460b, p. 123.
The case at bar involves two contracts. The first of these was made in Cuba in 1948 and insured the life of the appellee. Among other things it contained a continuing irrevocable offer by the appellant to enter into a contract to pay a determinable cash surrender value to the appellee upon his acceptance thereof. The second was made in Florida on October 11, 1961, when the appellee accepted the offer by making formal demand for the payment of the cash surrender value. It was at this time and place that the obligation of the appellant to pay the cash surrender value became a fixed and perfected obligation  a matured debt with all other obligations merged into it. See Mutual Life Ins. Co. v. Kaiser, supra, and numerous cases cited therein. This latter contract was the one breached by the appellant's refusal to pay and the one sued upon by the appellee. Since it was made in Florida, Florida law should control and the appellee is entitled to recover a judgment in the amount of $13,825.32, plus interest and cost in United States dollars as expressly provided in the contract of insurance.
Even assuming arguendo that the agreement to pay cash surrender value should be governed by the laws of Cuba, I think the result would be the same. That is, the appellee would be entitled to payment in United States dollars. The Cuban laws or decrees upon which the appellant relies do not require a different result.
The 1948 law simply displaced United States dollars as legal tender currency for the redemption of debts in the territory of Cuba. The acts of 1959 and 1961 simply granted power to the Banco Nacional de Cuba to regulate the issuance of currency and established that "the coins and bills issued by the Banco Nacional de Cuba shall be the only ones of legal tender and shall be admitted in payment of any obligation payable in the Republic. When they have been or are agreed upon in another currency, they shall be settled and paid necessarily in currency of legal tender." These acts only prohibit the export of currency or securities or the transfer of funds to points abroad and do not attempt by their scope, inference or implication, to affect funds which may have already been located abroad or possessed by nationals in other states.
The appellant is a foreign insurance company authorized to do business in Florida. This court and the Supreme Court of Florida have held that resident aliens may, if jurisdiction can be legally obtained, bring suits against such insurers in the courts of Florida to recover on policies such as the one involved here. See Confederation of Canada Life Ins. Co. v. Vega y Arminan, Fla.App. 1961, 132 So.2d 867, cert. den. with opinion, Fla., 144 So.2d 805. Having been authorized to do business in Florida, the appellant is required, and we assume it does, to maintain as trust deposits with public officials, or trust institutions approved by the insurance commissioner, a minimum of $300,000 or its equivalent in assets in compliance with the terms of § 624.0211, Fla. Stat., F.S.A. Section 624.0211(3), Fla. Stat., F.S.A., provides:
"Any such deposit made in this state shall be held for the protection of the insurer's policyholders or policyholders and creditors in the United States * * *."
Thus, the appellant has funds in Florida and the United States which it could use to discharge its obligation to the appellee and would not be forced to violate the laws and decrees of Cuba by exporting currency or transporting funds from Cuba to the United *325 States. See South American Petroleum Corp. v. Colombian Petroleum Co., 177 Misc. 756, 31 N.Y.S.2d 771.
As indicated by the opinions expressed herein, I would affirm the judgment.
NOTES
[1] That sum represented the amount of the cash surrender value under the policy, in dollars. It was stipulated that "The total cash surrender value of the policy as at March 15th, 1962 was 13,825.53." Plaintiff claimed and received judgment for United States dollars in that amount. Defendant demanded the right to pay only in Cuban pesos.
[2] This case does not present any question or problem of expropriation, such as concerned the court in Banco Nacional De Cuba v. Sabbatino, 2 Cir., 1962, 307 F.2d 845.
[3] The policy provided that it became effective upon delivery and payment of the first premium. The first premium was paid in Cuba. That fixed Cuba as the place of the making of the contract. See Equitable Life Assur. Soc. of the United States of America v. McRee, 75 Fla. 257, 78 So. 22; Columbian National Life Insurance Co. v. Lanigan, 154 Fla. 760, 19 So.2d 67.
[4] The policy expressly provided that payments thereunder were to be made in Havana, Cuba.
[5] There is authority that does not regard as conclusive the place of making or performance but rather lays emphasis upon the law of the place that has the most significant contacts with the matter in dispute. See Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954).
[6] Furthermore, appellee was a citizen of Cuba who had made a contract in that country for performance there. "[I]t cannot be against the public policy of this state to hold nationals to the contracts which they have made in their own country to be performed there according to the laws of that country." Dougherty v. Equitable Life Assur. Soc. of United States of America, 266 N.Y. 71, 90, 193 N.E. 897, 903 (1934). See also Holzer v. Deutche Reichbahn-Gesellschaft, 277 N.Y. 474, 14 N.E.2d 798 (1938).