## GUARANTY TRUST CO., TRUSTEE, *v.* HENWOOD, TRUSTEE, ET AL.[*]

No. 384. Argued February 8, 9, 1939.—Decided May 22, 1939.

---

[*] Together with No. 495, *Chemical Bank & Trust Co., Trustee, v. Henwood, Trustee,* also on writ of certiorari to the Circuit Court of Appeals for the Eighth Circuit.

*Mr. John W. Davis* on the reargument, and with *Mr. Ralph M. Carson* on the original argument, for petitioner in No. 384. *Messrs. Edwin S. S. Sunderland, Malcolm Fooshee,* and *J. Paschall Davis* were with them on the briefs.

*Messrs. A. H. Kiskaddon* and *Carleton S. Hadley* for Henwood, Trustee, and *Mr. George L. Buland,* with whom *Mr. Ben C. Dey* was on the brief, for the Southern Pacific Co., respondents in No. 384,—on the reargument and the original argument.

*Mr. Alfred H. Phillips,* on the reargument and on the original argument, for petitioner in No. 495.

*Mr. Carleton S. Hadley,* with whom *Mr. A. H. Kiskaddon* was on the briefs, on the reargument and on the original argument, for respondents in No. 495.

By leave of Court, briefs of *amici curiae* were filed by *Solicitor General Jackson, Messrs. Paul A. Freund, Ed-*

ward H. Foley, Jr., Bernard Bernstein, John W. Pehle, and Joseph B. Friedman, on behalf of the United States, urging applicability of the Joint Resolution to the obligations involved; and by Messrs. Harry Hoffman and Clifford R. Schuman, on behalf of Anglo-Continentale Treuhand, A. G., et al., bondholders.

MR. JUSTICE BLACK delivered the opinion of the Court.

In the bankruptcy reorganization of the St. Louis Southwestern Railway Company, a Missouri Corporation, petitioners filed claims for bondholders. They asserted a right under the bonds to be paid in Dutch guilders, and asked that their claims—based upon guilder value—be allowed for $37,335,525.12. The trustee in bankruptcy contended, and the courts below held that the Joint Resolution of June 5, 1933,[1] made the bonds dischargeable by payment of current legal tender United States money,[2] and petitioners' claims were accordingly allowed for $21,638,000.00, the face amount of their bonds in dollars.

These bonds, secured by a trust mortgage, were issued and sold in the United States in 1912. Purchasers paid and the railroad received United States dollars, and until 1936 interest was regularly paid in dollars.

The asserted right to guilder payment rests upon a provision of the bonds concededly granting holders an

---

[1] 48 Stat. 112, 31 U. S. C. 463.

[2] 98 F. 2d 160, 179. The Court of Appeals for the Second Circuit previously held to the contrary, Anglo-Continentale Treuhand, A. G. v. St. Louis Southwestern Ry. Co., 81 F. 2d 11, cert. den. 298 U. S. 655, and the Court of Appeals of New York did likewise in Zurich General & A. L. Ins. Co. v. Bethlehem Steel Co., and Anglo-Continentale Treuhand v. Bethlehem Steel Co., 279 N. Y. 495, 790; 18 N. E. 2d 673; 19 N. E. 2d 89; post, p. 265. Because of the divergence of views on this important question, we granted certiorari, 305 U. S. 588.

option to elect payment in dollars, guilders, pounds, marks, or francs. This multiple currency provision was authorized by the following terms of the mortgage securing the bonds:

". . . the . . . Bonds may be payable, at the option of the holder, both as to principal and interest, at some one or more of the following places in addition to the City of New York, and in the moneys current at such respective places of payment, at the following rates of exchange or equivalents of $1,000, viz.: In London, England, £205.15.2 Sterling, or in Amsterdam, Holland, 2490 guilders, or in Berlin, Germany, 4200 marks, D. R. W., or in Paris, France, 5180 francs; . . ."

The bonds themselves provide:

"St. Louis Southwestern Railway Company, . . . for value received, hereby promises to pay to the bearer, or, if registered, to the registered holder, of this bond, on the first day of January, 1952, at its office or agency in the Borough of Manhattan, City and State of New York, One Thousand Dollars in gold coin of the United States of America, of or equal to the standard of weight and fineness as it existed January 1, 1912, or in London, England, £205 15s 2d, or in Amsterdam, Holland, 2490 guilders, or in Berlin, Germany, marks 4200, D. R. W., or in Paris, France, 5180 francs, and to pay interest thereon, at the rate of five per cent. per annum, from the first day of January, 1912, in said respective currencies, semi-annually . . ."

Since the parties agree that the terms of the bonds granted holders an option to elect payment in guilders, we must determine whether, despite this option, the Joint Resolution operated to make the bonds dischargeable in current United States legal tender—a dollar of legal tender to be repaid for every dollar borrowed.

Analysis of the terms of the Resolution [3] discloses, first, that Congress declared certain types of contractual provisions against public policy in terms so broad as to include then existing contracts, as well as those thereafter to be

---

[3] "JOINT RESOLUTION

"To assure uniform value to the coins and currencies of the United States.

"Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

"Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

"(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United

made. In addition, future use of such proscribed provisions was expressly prohibited, whether actually contained in an obligation payable in money of the United States or separately "made with respect thereto." This proscription embraced "every provision" purporting to give an obligee a right to require payment in (1) gold; (2) a particular kind of coin or currency of the United States; or (3) in an amount of United States money measured by gold or a particular kind of United States coin or currency.

Having thus unmistakably stamped illegality upon both outstanding and future contractual provisions designed to require payment by debtors in a frozen money value rather than in a dollar of legal tender current at date of payment, Congress—apparently to obviate any possible misunderstanding as to the breadth of its objective—added, with studied precision, a catchall second sentence sweeping in "every obligation," existing or future, "payable in money of the United States," irrespec-

States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations.

"Sec. 2. The last sentence of paragraph (1) of subsection (b) of section 43 of the Act entitled 'An Act to relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes', approved May 12, 1933, is amended to read as follows:

" 'All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations) heretofore or hereafter coined or issued, shall be legal tender for all debts, public and private, public charges, taxes, duties, and dues, except that gold coins, when below the standard weight and limit of tolerance provided by law for the single piece, shall be legal tender only at valuation in proportion to their actual weight.'

"Approved, June 5, 1933, 4.40 p. m."

tive of "whether or not any such provision is contained therein or made with respect thereto." The obligations hit at by Congress were those "payable in money of the United States." All such obligations were declared dischargeable "upon payment, dollar for dollar, in any coin or currency [of the United States] which at the time of payment is legal tender for public and private debts." It results that if petitioners' claims rest upon "obligation[s] . . . payable in money of the United States," by the terms of the Resolution they shall be discharged upon payment of current legal tender dollars equal to the number of dollars promised in gold or a particular kind of money. Decision must therefore turn upon the nature of the "obligation[s] . . . incurred" by the railroad in its bond contracts of 1912.

These bonds provide that, "For a description of the property and franchises mortgaged, the nature and extent of the security, the rights of the holders of said bonds under the same and the terms and conditions upon which such bonds are issued and secured, reference is made to the . . . Mortgage." In determining the nature of the railroad's obligation, we, accordingly, look both to the mortgage and the bonds.

It appears that—

The railroad executed the mortgage in 1912 to the Guaranty Trust Company of New York as trustee, to secure forty-year mortgage bonds "limited to an aggregate principal amount of One Hundred Million Dollars ($100,000,000.00) at any one time outstanding . . . to be payable on the first day of January, 1952, with interest at the rate of five per cent per annum payable semiannually . . ."; the bonds are payable optionally in foreign currencies as indicated above; registration in New York is required of bonds subjected to registration; to be valid all bonds must be authenticated by the Guaranty Trust Company in New York; non-coupon bonds and

coupon bonds are interchangeable upon request, but non-coupon bonds contain no option for payment in foreign currencies; the New York trustee is granted broad supervisory powers (for the benefit of the bondholders) over finances and operations of the railroad; the railroad is required to keep an office in New York where bonds and coupons can be presented for payment, but is not required to keep any foreign offices; in the event of default in payment of bonds or coupons, the New York trustee is authorized, through its agents or attorneys, to take charge of the mortgaged property, to sell under foreclosure proceedings in the United States, and to protect bondholders' interests by employment of attorneys and institution of judicial proceedings either in law or equity; "for the equal benefit of all holders of . . . outstanding bonds and coupons"; should the Guaranty Trust Company resign as Trustee, the bondholders may designate another which, however, 'must always be a trust company having an office in the Borough of Manhattan, in the City of New York, N. Y."

The mortgaged property is located in the United States; the trustee was required to be a New York trust company; enforcement of the trust security, collection of bonds and interest, employment of attorneys, institution of legal proceedings and distribution of assembled assets, were all responsibilities placed upon the trustee located in New York, and obviously contemplated that any necessary judicial proceedings would be had in this country under the governing law of the United States. Both the mortgage and bonds are domestic obligations, and the law of this country must determine their interpretation, their nature, and the obligations enforceable under them.[4] The Joint Resolution thus must govern if the

---

[4] *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 453, 459; *United States* v. *North Carolina*, 136 U. S. 211, 222; *R.* v. *International Trustee*, [1937] 2 All E. R. 164; *Mount Albert Borough Council* v.

bonds are, within its terms, "obligation[s] . . . payable in money of the United States."

In their construction of the bonds, petitioners urge that each of the alternative promises to pay in a foreign currency is a separate and independent "obligation" to pay. From this, they argue that the only "obligation" for which enforcement is here sought is one "payable" in guilders which must be treated as though it were an entirely separate and independent promise of the railroad. But the railroad undertook only a single obligation to repay the money it borrowed. Repayment of that money might be called for in any one, but only one, of the five different types of money. This, however, did not divide the railroad's undertaking to repay into five separate and independent obligations to repay the same loan. Payment under the contract in any one of the currencies selected by the bondholder would discharge the entire single obligation of the debtor. Payment in guilders, after payment in guilders was elected, would nonetheless discharge an obligation which prior to such election and payment was an obligation also payable in United States dollars. The language of the Joint Resolution was intended to refer to a monetary obligation in its entirety. That which the Joint Resolution made dischargeable was the debt—the monetary obligation to pay. This debtor's obligation was a monetary obligation. The foreign currencies promised were not bartered for as commodities, but their function was that of money to be paid in countries in which they were legal tender and upon them interest was to be paid.[5] Interest is not paid on commodities but on monetary obligations. And these

---

*Australasian, T. & G. S. Life Assurance Soc.*, [1938] A. C. 224; Judgment of the Supreme Court of Sweden, (Jan. 30, 1937), reported in Bulletin de L'Institut Juridique International, April, 1937, pp. 327, 334.

[5] *Holyoke Power Co.* v. *Paper Co.*, 300 U. S. 324, 335–336; *Norman* v. *Baltimore & O. R. Co.*, 294 U. S. 240, 302.

promises in alternative currencies were not separate and independent contracts or obligations, but were parts of one and the same monetary obligation of the debtor.

The point is made, however, that this obligation of the railroad was never payable in United States money because the option to receive payment in dollars has never been exercised. Conceding that one meaning of "payable" is "capable of being paid," petitioners nevertheless urge that the use of this meaning should not be attributed to Congress, but that instead we must narrow and restrict "payable" to mean an absolute and unconditional obligation. But the railroad, since the day its bonds were issued, was under obligation to hold itself prepared to pay United States money—or any one of the optional currencies. And, on the date the Resolution went into effect, no election had been made so that the railroad was, at that time, still under obligation to pay dollars. If prior to election by the holders the railroad was under no obligation to pay United States money, it was likewise under no obligation to pay any money, United States or otherwise, although it then had outstanding a $100,000,000.00 mortgage on all of its properties. Neither in logic nor law can it be said that the railroad's promise, secured by a $100,000,000.00 mortgage, to pay in any one of five currencies was not an obligation payable in any currency until express election of payment in a particular currency was made. Legal rights and obligations came into existence when the contracts for purchase of the bonds were completed. Since the words "obligation[s] . . . payable in money of the United States" are clearly broad enough to require inclusion of these multiple currency obligations, there is no justification here for restricting the meaning of these words of the Resolution. Consideration of the evils aimed at leaves no doubt but that such restriction would do violence to the intention of the Congress.

The report of the Senate Committee on the Resolution opens with words revealing its purpose. It is there stated

that "Certain questions of interpretation have arisen with respect to the legislation empowering the President to prevent the withdrawal and hoarding of gold and the provision of the Thomas amendment [6] *making all coins and currencies legal tender for all debts.* Additional and immediate legislation is necessary to remove the disturbing effect of this uncertainty and to insure the success of the policy by closing possible *legal loopholes* and removing inconsistencies." [7] (Italics supplied.) T h e comprehensive language of the Resolution was intended— as by its terms it did—to close "legal loopholes" contributing to "dislocation of the domestic economy which would be caused by such a disparity of conditions in which, it is insisted, those debtors under gold clauses should be required to pay one dollar and sixty-nine cents in currency while respectively receiving their taxes, rates, charges and prices on the basis of one dollar of that currency." [8] Here, the admitted purpose of the multiple currency provision supplementing the gold clause was the same as that of the gold clause itself, that is, to afford creditors of United States debtors on domestic money obligations contractual protection against possible depreciation of United States money. It was a plan, wholly legal when contrived, specifically designed to require debtors to pay 1912 gold dollars or fixed amounts in foreign currencies which were the exact equivalents of gold dollars in 1912. In purpose, pattern and, as shown here, in result, the multiple currency provision is identical with the practice Congress declared to be against public policy, and it furthers a mischief which the Resolution was enacted to end.

The mischief Congress intended to end will not end if the multiple currency provision of these bonds is held to

---

[6] 48 Stat. 51, § 43.

[7] Sen. Rep. No. 99, 73d Cong., 1st Sess.

[8] *Norman v. Baltimore & O. R. Co., supra,* 315–16.

be unaffected by the Resolution. Congress sought to outlaw all contractual provisions which require debtors, who have bound themselves to pay United States dollars, to pay a greater number of dollars than promised. The Resolution intended that debtors under obligation to pay dollars should not have their debts tied to any fixed value of particular money, but that their entire obligations should be measured by and tied to the actual number of dollars promised, dollar for dollar. A multiple currency provision was inserted in these bonds in order to tie this debtor to a fixed value of particular money, and, relying upon this provision, petitioners demand more dollars than promised in the bonds. The provision is thus clearly at cross purposes with the Resolution. By a simple mathematical calculation translating guilder value into dollar value, petitioners will, if the Resolution is not applied to them, enforce the obligations of this debtor, not dollar for dollar as the Resolution provides, but more than a dollar and a half for every dollar borrowed, and the purpose of Congress, that no such premium need be paid, will be completely defeated.

When the Joint Resolution was enacted the railroad had by its promise assumed obligations to pay its bonds in dollars; its obligations were therefore "payable in money of the United States" and so fall squarely within the letter, as well as the spirit of the Resolution making obligations dischargeable by payment of current United States legal tender money.

There remains the argument of petitioners that the Resolution, if construed to forbid enforcement of the option to demand payment in guilders, nullifies contractual rights in violation of the Fifth Amendment to the Constitution. But, as has already been pointed out, the contracts on which the claims for guilders rest are domestic obligations, controlled by and to be interpreted under the law of the United States. And contracts be-

tween private parties cannot create vested rights which serve to restrict and limit an exercise of a constitutional power of Congress.[9] These bonds and their securing mortgage were created subject not only to the exercise by Congress of its constitutional power "to coin money, regulate the value thereof, and of foreign coin," but also to "the full authority of the Congress in relation to the currency." The extent of that authority of Congress has been recently pointed out: "The broad and comprehensive national authority over the subjects of revenue, finance and currency is derived from the aggregate of the powers granted to the Congress, embracing the powers to lay and collect taxes, to borrow money, to regulate commerce with foreign nations and among the several States, to coin money, regulate the value thereof, and of foreign coin, and fix the standards of weights and measures, and the added express power 'to make all laws which shall be necessary and proper for carrying into execution' the other enumerated powers." [10]

Under these powers, Congress was authorized—as it did in the Resolution—to establish, regulate and control the national currency and to make that currency legal tender money for all purposes, including payment of domestic dollar obligations with options for payment in foreign currencies. Whether it was "wise and expedient" to do so was, under the Constitution, a determination to be made by the Congress.[11] The Resolution that made these creditors' bonds dischargeable in the same United States legal tender which other creditors in this country must accept, does not contravene the Fifth Amendment.

---

[9] *Norman* v. *Baltimore & O. R. Co., supra,* 306–311; cf., *Home Bldg. & L. Assn.* v. *Blaisdell,* 290 U. S. 398, 435.

[10] *Norman* v. *Baltimore & O. R. Co., supra,* 303.

[11] *Juilliard* v. *Greenman* (Legal Tender Case), 110 U. S. 421, 448, 450.

260

Our conclusion that the Joint Resolution makes petitioners' claims in bankruptcy allowable dollar for dollar renders consideration of subsidiary questions unnecessary.

The judgments are

*Affirmed.*

MR. JUSTICE STONE, dissenting.

Without considering the question whether the bondholders in these cases have properly exercised their options, I cannot agree that the Joint Resolution of Congress of June 5, 1933, has set at naught the promise of the bonds to pay guilders to the holders at their election.

In each case the bonds contain alternative and mutually exclusive undertakings. The holder could if he wished demand payment in United States gold dollars of a fixed standard or their equivalent in United States currency. The alternative promise is for payment abroad of specified amounts of any one of several foreign currencies, without reference to their gold value at the time of payment. Its performance is as independent of gold or gold value as if it had called for the delivery of a specified amount of wheat, sugar or coffee, or the performance of specified services.

Any construction of the gold clause resolution which would in the circumstances of the present case preclude payment in foreign money would equally forbid performance of an alternative promise calling for the delivery of a commodity or the rendition of services. Hence the decisive question is whether the resolution admits of a construction which would compel one whose contract stipulates for delivery at his option of a cargo of sugar to accept instead payment of a specified amount in legal tender dollars, merely because by the terms of his contract he might have demanded, though he did not, an equal number of gold dollars.

When the Joint Resolution was adopted there were many obligations of American citizens payable abroad exclusively in foreign currency, and the attendant devaluation of the dollar greatly increased the burden of performance of such contracts through the necessity of purchasing with depreciated dollars the foreign exchange required for their fulfillment. But it must be conceded that Congress did not undertake to relieve any American citizen of that burden, and it is not contended that the Joint Resolution provided for the discharge of any obligations payable in foreign currency, not measured in gold, except in the case where the promise to pay in foreign money is an alternative for the promise to pay in dollars. After devaluation of the dollar the burden on American citizens of meeting obligations abroad by payment in foreign currencies may well have been as great whether the undertaking was unconditional or to pay upon a condition which had happened, or whether the obligation was to pay in a foreign currency or to supply goods which must be acquired by the expenditure of depreciated dollars.

We can find nothing in the legislative history of the Joint Resolution or its language to suggest any Congressional policy to relieve from the one form of obligation more than another, or to indicate that the resolution was aimed at anything other than provisions calling for payment in gold value or gold dollars or their equivalent, which Congress explicitly named and described as the evil to be remedied, both in the Joint Resolution itself and in the committee reports attending its adoption. See Sen. Rep. No. 99, 73d Cong., 1st Sess.; H. R. Rep. No. 169, 73d Cong., 1st Sess.

The Joint Resolution of Congress and the committee reports make no mention of obligations dischargeable in foreign currencies or by delivery of commodities or performance of services. If it was the purpose of Congress

to control such obligations through the exercise of its power to regulate the value of money, that fact must be discoverable from the language of the resolution or from some underlying public policy, to which its words and the records of Congress give no clue. Shortly before the adoption of the resolution, Congress had authorized the President to devalue the dollar. By appropriate legislation and executive action, gold payments by the Treasury had been suspended, the hoarding of gold and its exportation had been prohibited, and all persons had been required to deliver gold owned by them to the Treasury. See *Norman* v. *Baltimore & Ohio R. Co.*, 294 U. S. 240, 295 *et seq.* It was obvious that these measures, aimed at the suppression of the use of gold as a standard of currency value, would fail of their purpose unless all payments in gold of the established standard or its equivalent were outlawed. The reports of the Congressional committees recommending the adoption of the resolution indicate clearly enough that such was its purpose. They give no hint that more was intended. See Sen. Rep. No. 99, 73d Cong., 1st Sess.; H. R. Rep. No. 169, 73d Cong., 1st Sess.

The recitals of the Joint Resolution declare that it is aimed at "the holding of or dealing in gold" and the "provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby." No other purpose is suggested. The enacting part of the resolution proscribes "every provision . . . which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby," and declares "Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be

discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender . . ." "Obligation," it states, "means an obligation . . . payable in money of the United States." Thus the resolution proclaims that it is aimed at gold clauses and declares, if language is to be taken in its plain and most obvious sense, that provisions requiring payment in gold dollars or measured by gold are illegal and that every promise or obligation "payable in money of the United States" (not in guilders) shall be discharged "dollar for dollar" in legal tender currency.

To arrive at the conclusion that the resolution compels the present bondholders to accept dollars instead of the guilders for which they have contracted, it is necessary to say that "obligation," which the Joint Resolution defines as obligation "payable in money of the United States" and requires to be discharged "dollar for dollar" in legal tender, includes the obligation payable in guilders. This difficulty is bridged by recourse to a major operation of statutory reconstruction. It is said that "obligation" means, not the obligation or promise which is defined by the resolution as that "payable in money of the United States" and in which the gold clause provision is "contained" and "with respect" to which the provision is "made," but includes all obligations, although not dischargeable in money of the United States or in gold, which may be written into the instrument or document containing alternative promises, one of which is to pay in dollars. The "obligation" of the resolution "with respect" to which the gold clause is "made" is thus treated as synonymous with the instrument containing the multiple obligations, and all the provisions in it (not alone the promise to pay dollars) are now held to be dischargeable in dollars merely because one of the alternative promises "contained" a provision payable in "money of the United States," although the bondholder is entitled by his contract to demand performance of a promise to pay guild-

264

ers not measured by gold. Thus, starting with a resolution avowedly directed at gold clauses, we are brought to the extraordinary conclusion that a promise to pay foreign currency is void if expressed in an instrument containing an alternative promise to pay in money of the United States whether of gold standard or not.

The argument is not persuasive, because it rests both upon a strained and unnatural construction of the resolution and upon an assumption that there was a Congressional policy to strike down provisions for the alternative discharge of dollar obligations by payment in foreign currency not tied to gold, which finds no support in the language of the Joint Resolution or its legislative history. It seems fair to suppose that if Congress proposed to end all possibility of creating an international market for bonds payable in dollars or alternatively abroad in foreign currencies, both without gold value, it would have given some more explicit indication of that purpose than is exhibited by the Joint Resolution. Even if we assume that Congress would have struck down such alternative currency clauses had it considered the matter, we are not free to do what Congress might have done but did not, or what we may think it ought to have done to lessen the rigors of our own currency devaluation for those who had made contracts for payment abroad in foreign currency without gold value.

In any case it seems plain that if Congress had made the attempt it would not have chosen to do so in terms which, if the Court's construction of the Joint Resolution be accepted, are broad enough to strike down every conceivable provision for payment in foreign currency, delivery of commodities, or performance of services as an alternative for a promise to pay dollars, whether of gold standard or not.

The CHIEF JUSTICE, MR. JUSTICE McREYNOLDS and MR. JUSTICE BUTLER concur in this opinion.