**In re Carol Sue GOODRICH, Debtor.**

**Bankruptcy No. 2–80–01427.**

United States Bankruptcy Court,
S. D. Ohio, E. D.

Nov. 19, 1980.

Richard Carter Irvin, Columbus, Ohio, for debtor.

H. Grant Stephenson, Columbus, Ohio, for creditor.

## OPINION AND ORDER ON MOTION TO AVOID LIEN AND OBJECTION THERETO

G. L. PETTIGREW, Bankruptcy Judge.

This matter is before the Court on the debtor's motion to avoid the lien of Huntington National Bank pursuant to 11 U.S.C. § 522(f)(2)(A) and Huntington's objection thereto.

### Facts

The facts presented are undisputed. The debtor filed her voluntary petition in bankruptcy on April 30, 1980. In Schedule A–2, she listed Huntington National Bank as a creditor holding a claim of $1,294.61, secured by a non–possessory, non–purchase money interest in household goods valued by the debtor at $800. In Schedule B–4, the debtor claimed an exemption in these household goods in the maximum amount allowed by O.R.C. § 2329.66(A)(4)(b). On July 8, 1980, the debtor filed a motion to avoid the lien of Huntington pursuant to 11 U.S.C. § 522(f)(2)(A). That the household goods are of the variety described in § 522(f)(2)(A) is undisputed. Huntington objected to the motion of the debtor in that it perfected its security interest on March 28, 1978, prior to the adoption of the Bankruptcy Reform Act of 1978. Huntington argues that the application of 11 U.S.C. § 522(f) to avoid its lien on the household goods of the debtor is a violation of due process as guaranteed by the Fifth Amendment of the U.S. Constitution.

### Discussion

The sole issue before this Court is the constitutionality of 11 U.S.C. § 522(f)(2)(A) as applied. That provision of the Bankruptcy Code states:

"(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in

property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

.    .    .    .    .

"(2) a nonpossessory, nonpurchase money security interest in any—

"(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;"

This provision, as part of the Bankruptcy Reform Act of 1978, was enacted by Congress and was approved on November 6, 1978, and became effective on October 1, 1979. The Huntington argues that because its lien on the household goods of the debtor was perfected prior to the enactment of this provision, the retroactive application of the provision to its lien would violate the due process clause of the Fifth Amendment.

A constitutional challenge to legislation duly enacted by Congress is a matter of grave concern and must be approached in a manner commensurate with its magnitude. The court in *Knox v. Lee*, 12 Wall. 457, 20 L.Ed. 287 (1871), states:

"A decent respect for a co–ordinate branch of the government demands that the judiciary should presume, until the contrary is clearly shown, that there has been no transgression of power by Congress. . . . Such has always been the rule. . . . It is incumbent, therefore, upon those who affirm the unconstitutionality of an act of Congress to show clearly that it is in violation of the provisions of the Constitution. It is not sufficient for them that they succeed in raising a doubt." at 531.

The court in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1975), affirms and refines that position:

"It is by now well established that legislative acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." at 15.

Article 1, § 8 of the Constitution provides that:

"The congress shall have Power . . . To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States; . . . And To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

A brief examination of the development of laws on the subject of bankruptcy, or the history of the legislative exercise of that power, may be useful.

The American concept of bankruptcy is rooted in the English experience. Early English Bankruptcy Law was a response to that country's evolution from an agrarian to a commercial society. With the growth of commerce came an increasing need to protect and stabilize the new economic base, a need for creditor remedies beyond the common law remedies of execution and attachment.

The first English Bankruptcy Act, enacted in 1542, addressed itself only to the fraudulent debtor. It provided for the seizure and pro rata distribution of all the debtor's assets. No provision was made in this involuntary remedy for discharge. This legislation and its immediate successors confined their scope to the fraudulent trader or handler of money.

It was not until 1705 that the aura of criminality was statutorily removed from the body of English Bankruptcy Law and the debtor who relinquished his assets and complied with various other requirements might qualify for discharge.

The first American Bankruptcy Act, passed in 1800, closely traced the English experience as a tool to be used by the creditor against the fraudulent debtor. The

political climate and the difficulties inherent in the infant federalism brought the act's early repeal in 1803, not to be replaced until 1841 with an act conceded to be the precursor of contemporary bankruptcy legislation. This legislation, though in effect for only three years, was the first to provide for voluntary bankruptcy. Relief was afforded the honest debtor while creditors retained their remedies for fraud.

The court in *Continental Bank v. Rock Island R.R.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935), states:

"The act of 1800, like the English law, was conceived in the view that the bankrupt was dishonest; while the act of 1841 and the later acts proceeded upon the assumption that he might be honest but unfortunate. One of the primary purposes of these acts was to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes,' and to give him 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 [54 S.Ct. 695, 699, 78 L.Ed. 1230].

"By the act of 1867, . . . the debtor for the first time was permitted either before or after an adjudication in bankruptcy, to propose terms of composition to his creditors to become binding upon their acceptance by a designated majority and confirmation by the judge." at 670, 671, 55 S.Ct. at 603, 604.

That court, discussing the import of this historical progression, states:

"The fundamental and radically progressive nature of these extensions becomes apparent upon their mere statement; but all have been judicially approved or accepted as falling within the power conferred by the bankruptcy clause of the Constitution. Taken together, they demonstrate in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of

business and development of human activities from 1800 to the present day. And these acts, far reaching though they be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed." at 671, 55 S.Ct. at 604.

■ It can hardly be questioned that Congress has the power to legislate on the subject of bankruptcy, *Hanover National Bank of New York v. Moyses*, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902). However, the manner in which it exercises its broad grant of power is subject to the limitations and guaranties of other constitutional provisions such as due process.

■ In examining the constitutionality of a specific act of Congress, it is incumbent upon the Court to examine the act in light of the express grant of power given Congress to legislate in a particular field. The Court must ascertain if a specific act is an appropriate means to the execution or exercise of that power. This inquiry, however, may not encompass the degree of appropriateness of the act for that determination is solely within the legislative domain. Central to this consideration are the time in which the law was enacted and the circumstances of its enactment. *Knox v. Lee, supra.*

Based on the premise that, as a policy consideration, the destitute debtor is a public burden and the historical concept of fresh start, the Congress has seen fit to allow the debtor to claim certain property as exempt from his creditors, that property denominated by either federal statute or state statute via a specific grant of authority given state legislatures by Congress.

"The historical purpose of these exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge. The purpose has not changed. . . .

". . . H.R. 8200 adopts the position that there is a Federal interest in seeing that a debtor that goes through bankruptcy

comes out with adequate possessions to begin his fresh start." House Report No. 95–595, 95th Cong., 1st Sess. (1977) 126, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6087.

Recognizing that the typical consumer debtor is susceptible to entering into financing agreements which, if enforced, would totally subvert the legislative intent of adequate exemption provisions, Congress strengthened its grant of exemptions with 11 U.S.C. § 522(f). The House Report concerning this subsection states:

"In addition, the bill gives the debtor certain rights not available under current law with respect to exempt property. The debtor may void any judicial lien on exempt property, and any nonpurchase money security interest in certain exempt property such as household goods. The first right allows the debtor to undo the actions of creditors that bring legal actions against the debtor shortly before bankruptcy. Bankruptcy exists to provide relief for an overburdened debtor. If a creditor beats the debtor into court, the debtor is nevertheless entitled to his exemptions. The second right will be of more significance for the average consumer debtor. Frequently, creditors lending money to a consumer debtor take a security interest in all of the debtor's belongings and obtain a waiver by the debtor of his exemptions. In most of these cases, the debtor is unaware of the consequences of the forms he signs. The creditor's experience provides him with a substantial advantage. If the debtor encounters financial difficulty, creditors often use threats of repossession of all of the debtor's household goods as a means of obtaining payment.

"In fact, were the creditor to carry through on his threat and foreclose on the property, he would receive little, for household goods have little resale value. They are far more valuable to the creditors in the debtor's hands as they provide a credible basis for the threat, because the replacement costs of the goods are generally high. The creditors rarely repossess, and debtors, ignorant of the creditors' true intentions, are coerced into payments they simply cannot afford to make.

"The exemption provision allows the debtor, after bankruptcy has been filed, and creditor collection techniques have been stayed, to undo the consequences of a contract of adhesion, signed in ignorance by permitting the invalidation of nonpurchase money security interests in household goods. Such security interests have too often been used by over–reaching creditors. This bill eliminates any unfair advantage the creditors have." House Report No. 95–595, 95th Cong., 1st Sess. (1977) 126–127, U.S.Code Cong. & Admin.News 1978, p. 6087.

A blanket lien of the sort under discussion here gives the creditor rights in specific property, but such rights are illusory in that the value of that property in the hands of the creditor is usually negligible. As stated in the legislative history, the value of the blanket lien in all of the debtor's household possessions is as a remedy to enforce payment, post bankruptcy, of a contractual obligation to repay money. Further, the security agreement purporting to create rights in the household goods of the debtor was entered subject to the possible exercise of the rightful authority of Congress to legislate on the subject of bankruptcy.

The court in *Knox v. Lee, supra,* in upholding the retroactive application of the Legal Tender Acts to contracts previously entered, states:

"Nor can it be truly asserted that Congress may not, by its action, indirectly impair the obligation of contracts, if by the expression be meant rendering contracts fruitless, or partially fruitless. Directly, it may, confessedly, by passing a bankrupt act, embracing past as well as future transactions. This is obliterating contracts entirely. So it may relieve parties from their apparent obligations indirectly in a multitude of ways. It may declare war, or, even in peace, pass non–intercourse acts, or direct an embargo. All such measures may, and must, operate seriously upon existing contracts, and may not merely hinder, but relieve the parties to such contracts entirely from performance. . . .

"As in a state of civil society, property of a citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority." at 549–551.

The court in *Louisville & Nashville Railroad Company v. Mottley*, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911), upheld a provision passed by Congress pursuant to its power to regulate interstate commerce and the retroactive application of that provision to a contract made in settlement of a personal injury claim. The court, citing *Knox*, states:

"That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations is inconceivable. The framers of the Constitution never intended any such state of things to exist." at 482.

The court's sanction of congressional legislation pursuant to its authority to regulate currency and establish a monetary system and the retroactive application of that legislation is further seen in *Norman v. B & O Railroad Co.*, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935), and *Guaranty Trust Co. v. Henwood*, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266 (1939). The court in both instances upheld the retroactive application of Joint Resolution of June 5, 1933, which declared obligations requiring payment in gold or other specified currency to be payable only in legal tender as authorized by Congress. This action effectively devalued the worth of the obligation. The court in *Norman* states:

"Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." at 307–308, 55 S.Ct. at 415–416.

The court in *Fleming v. Rhodes*, 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947), extended this reasoning to rights acquired by judgments. The statute in question was § 205(a) of the Emergency Price Control Act, as amended by the Price Control Extension Act of July 25, 1946. The sole issue before that court was whether refusing to allow landlords to execute on judgments for restitution of leased property would violate the constitutional rights of the landlords "to retain the fruits of their vested rights in valid judgments." In upholding the application of the statute, the court states:

"Federal regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution. So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it. Immunity from federal regulation is not gained through forehanded contracts. Were it otherwise the paramount powers of Congress could be nullified by 'prophetic discernment.' The rights acquired by judgments have no different standing." at 107.

Most persuasive in the determination of the matter now under consideration is the decision in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1975). In pertinent part, mine operators contended that Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, violated due process by requiring them to compensate former employees who terminated work in the industry before the act was passed. The court found that such an imposition of liability was justified as "a rational measure to spread the costs of employee's disabilities to those who have profited" from the work of the employees. The court states:

"And it may be that liability imposed by the Act for disabilities suffered by former employees was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. See *Fleming v. Rhodes*,

331 U.S. 100 [67 S.Ct. 1140, 91 L.Ed. 1368] (1947); *Carpenter v. Wabash R. Co.,* 309 U.S. 23 [60 S.Ct. 416, 84 L.Ed. 558] (1940); *Norman v. Baltimore & Ohio R. Co.,* 294 U.S. 240 [55 S.Ct. 407, 79 L.Ed. 885] (1935); *Home Bldg. & Loan Assn. v. Blaisdell,* 290 U.S. 398 [54 S.Ct. 231, 78 L.Ed. 413] (1934); *Louisville & Nashville R. Co. v. Mottley,* 219 U.S. 467 [31 S.Ct. 265, 55 L.Ed. 297] (1911). This is true even though the effect of legislation is to impose a new duty or liability based on past acts." at 16, 96 S.Ct. at 2892.

Based on the foregoing, this Court finds that 11 U.S.C. § 522(f)(2)(A) readjusts the rights and burdens of creditors and debtors in a manner necessary to enforce the purposes of legislative grants of exemption. That it upsets otherwise settled expectations to the extent required for finding the section violative of due process as applied has not been sufficiently shown.

Wherefore, the debtor's motion to avoid the lien of the Huntington National Bank is hereby sustained.

IT IS SO ORDERED.