**BAUMLIN & ERNST, LTD., Appellee,**

v.

**GEMINI, LTD.; John L. Stickley & Company; John L. Stickley; John L. Stickley, Jr., Appellants.**

No. 80–1175.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 13, 1980.

Decided Dec. 30, 1980.

Robert B. Cordle, Charlotte, N. C. (Helms, Mulliss & Johnston, Charlotte, N. C., on brief), for appellants.

Larry B. Sitton, Greensboro, N. C. (William L. Young, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellee.

Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

Baumlin & Ernst, Ltd., plaintiff and appellee, is a Swiss corporation which manufactures and exports yarn for sale in the United States and elsewhere. Commencing in October of 1972, several lots were sold and delivered to Gemini, Ltd., a North Carolina corporation.

The initial lot and all subsequent lots were covered by an order confirmation form employed by appellee identical in all cases except for the specification as to date and price for each individual order. The order form, *inter alia*, states that, in the absence of an agreement to the contrary, prices would be expressed in Swiss francs per kilo.

When the account fell into arrears, suit was instituted, not only against Gemini, Ltd., but also to enforce asserted guarantees of the obligation made by John L. Stickley, John L. Stickley, Jr., and John L. Stickley & Co., a North Carolina corporation. The parties executed a stipulation which showed total orders of $213,831.85 less payments and a credit aggregating $69,581.96. The difference of $144,249.89 was stipulated to represent the outstanding indebtedness. Accrued interest brought the sum of $144,249.89 to a total of $220,509.20.[1]

The stipulation was entered on January 26, 1976, the day before the case was scheduled to proceed to trial in the United States District Court for the Western District of North Carolina. The only issues to be tried were whether or not the two Stickleys as individuals and the Stickley corporation were liable on guarantees of Gemini's obligation.

On the morning of trial the parties, assisted by Judge James B. McMillan, entered a stipulation which was expressed in the form of a consent judgment signed by all the parties as well as by Judge McMillan.

The consent judgment called for the staging of payments for the period extending to and including December 31, 1980. The defendants first confessed judgment in the aggregate sum of sfr. 569,067.70[2] with interest at 6% per annum from January 27, 1976. The consent judgment went on to provide, however, that the judgment would be fully satisfied if payments were made on a schedule as follows:

| | | | |
|---|---|---|---|
| 1. | On or before February 3, 1976 | sfr. | 13,024.22 |
| 2. | On or before December 31, 1976 | sfr. | 52,096.90 |
| 3. | On or before December 31, 1977 | sfr. | 65,121.12 |
| 4. | On or before December 31, 1978 | sfr. | 65,121.12 |
| 5. | On or before December 31, 1979 | sfr. | 65,121.12 |
| 6. | On or before December 31, 1980 | sfr. | 65,121.12 |
| | | sfr. | 325,605.60 |

Outstanding unpaid balances were to bear interest at the rate of 7% per annum, payments in Swiss francs were to be by cashier's checks, and the defendants agreed on demand to execute negotiable instruments evidencing the obligations.

In the event of a default in timely payment of the staged payments or of accrued interest, Baumlin & Ernst, Ltd. was entitled to immediate judgment and execution on the sum of sfr. 569,056.70, less credit for sums paid in the interim. To date all payments, save that which will fall due on December 31, 1980, have been made.

The consent judgment was expressed in francs and not in U. S. dollars because of the explicit and firm insistence on the part of Baumlin & Ernst, Ltd. that provision for payment in stages over a period in excess of four years introduced the possibility of currency fluctuations. Baumlin & Ernst, Ltd. was unwilling to run that risk in United States dollars and would only accept the exposure in Swiss francs.

For a time all was peaceful. Appellants paid the first five installments either in Swiss francs or in the current amount of dollars which, at the then prevalent rate of exchange, translated into the specified number of Swiss francs. However, the exchange rate has, on the whole, substantially worsened from the point of view of the holder of U. S. dollars. The 1976 rate of $.3875 applicable to the February 3, 1976 payments slid to $.4095 for the December 31, 1976 installments, to $.5146 for the December 31, 1977 installment, to $.6090 for the December 31, 1978 installment, and to $.625 for the December 31, 1979 installment. As of the writing of this opinion, the exchange rate had somewhat improved, from defendants' point of view, to $.5720.

On August 1, 1979, the Stickleys filed a Fed.R.Civ.P. Rule 60(b) motion to vacate

---

1. A dispute surfaced on appeal as to the correctness of the calculations by which the interest was computed. In light of the adoption by the parties of the interest figure, for purposes of the consent decree which they freely entered, there is no controversy as to it meriting investigation or resolution by us.

2. At the rate of exchange on January 27, 1976 of $.3875 the equivalent in dollars amounted to $220,509.20 (The precise amount would actually be $220,513.73, but the difference, $4.53, is certainly *de minimis*, and neither party has made anything of the truly trivial discrepancy.)

and set aside the consent judgment of January 27, 1976.[3] The motion rests on the proposition that, the judgment, having been expressed in Swiss francs and having called for its satisfaction through payments in Swiss francs, was void.[4] Allied to those grounds, defendants also advance allegedly equitable considerations under other provisions in Rule 60(b): "(5) . . . it is no longer equitable that the judgment should have prospective application;" and "(6) any other reason justifying relief from the operation of the judgment."[5]

The principal contention of appellants centers on the argument that statutory requirements governing currency of the United States and legal limits on monetary methods of satisfying obligations render the judgment void. There is, however, a substantial difference between a judgment which is erroneous and one which is altogether void:

A void judgment is to be distinguished from an erroneous one, in that the latter is subject only to direct attack. A void judgment is one which, from its inception,

was a complete nullity and without legal effect. In the interest of finality, the concept of void judgments is narrowly construed. . . . Only in the rare instance of a clear usurpation of power will a judgment be rendered void.

*Lubben v. Selective Service System Local Board No. 27*, 453 F.2d 645, 649 (1st Cir. 1972).

A judgment is not void merely because it is or may be erroneous. . . . For a judgment to be void under Rule 60(b)(4), it must be determined that the rendering court was powerless to enter it. If found at all, voidness usually arises for lack of subject matter jurisdiction or jurisdiction over the parties. It may also arise if the court's action involves a plain usurpation of power or if the court has acted in a manner inconsistent with due process of law.

*V. T. A., Inc. v. Airco., Inc.*, 597 F.2d 220, 224–25 (10th Cir. 1979).

▮ The present case clearly met diversity requirements for jurisdiction. More than

---

**3.** At the outset, we put to one side any possibility that, because the judgment was by consent of the parties, it has a contractual nature, and consequently is less subject to modification than if it were a standard, fully-litigated conclusion of the court. For the purposes of the case, we regard the consent judgment as no less eligible for treatment under Fed.R.Civ.P. 60(b) than any other judgment. *E. g., V. T. A., Inc. v. Airco, Inc.*, 597 F.2d 220, 224 (10th Cir. 1979) ("We note that the underlying judgment was by consent and has the same force and effect for 60(b) purposes as a judgment rendered on the merits following trial.")

**4.** Fed.R.Civ.P. 60(b)(4) reads:
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . (4) the judgment is void.

**5.** The grounds under Fed.R.Civ.P. 60(b)(1), (2), and (3) can have no application since not raised before expiration of one year after the judgment was entered. "The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken." Fed.R.Civ.P. 60(b).
The language in Fed.R.Civ.P. 60(b)(5) omitted from the quotation in the text has no applicability since the language is restricted to a situa-

tion in which the judgment has been satisfied, released, or discharged or a prior judgment upon which it is based has been reversed or otherwise vacated, yet a claim for payment of what has already been satisfied, released, discharged or reversed is still being or may be made. As to the payments already made, i. e. those which matured on December 31, 1979, and all prior dates, there is no contention by plaintiff that the judgment, to that extent, has not been *pro tanto* satisfied. There consequently is no need or occasion for relief from those previously discharged portions of the judgment, on the grounds that plaintiff is demanding payment of installments of December 31, 1979 or theretofore.

The contention of defendants is simply that only the conversion rate of $.3875 per Swiss franc in force in January 1976 should have been used throughout, so that the aggregate of the installments should have amounted to $126,172.17, and that, with the December 31, 1979 payment, of the then equivalent for sfr. 65,121.12 of $40,705.76, the transfers in dollars equalled in aggregate $140,256.42. On that approach defendants seek reimbursement of $14,084.25 ($140,256.42 minus $126,172.17), and an order excusing them from any payment on the December 31, 1980 installment.

$10,000 was in controversy with a Swiss corporation on one side and North Carolina individuals and corporations on the other. The court usurped no power nor did it act inconsistently with due process. All the parties clearly wanted the court to do as it did in entering the consent judgment and no one was then dissatisfied. The judgment, therefore, may, at most, have been erroneous, but any error, if it indeed existed, could have been attacked on appeal. Error, however, does not make the judgment void and, therefore, Fed.R.Civ.P. 60(b)(4) is inapplicable. *In re Texlon Corp.,* 596 F.2d 1092, 1099 (2d Cir. 1979) ("The financing order was not 'void' within the meaning of F.R.Civ.P. 60(b)(4).... Even if the order had been contrary to an express provision of the Bankruptcy Act, which we have held it was not, the order would not have exceeded the 'jurisdiction' of the court.... The financing order was within the parameters of the bankruptcy court's authority, '[a]nd even gross error in the decree would not render it void.' *Swift & Co. v. United States,* 276 U.S. 311, 330, [48 S.Ct. 311, 316, 72 L.Ed. 587].... "). *See also Gulf Coast Building and Supply Co., Inc. v. IBEW, Local 480,* 460 F.2d 105 .(5th Cir. 1972) (judgment which included prejudgment interest erroneous, but not void despite inconsistency with 28 U.S.C. § 1961 which provides that "interest shall be calculated from the date of entry of the judgment").

Appellants assert, however, that the cases holding a judgment at most erroneous but not void deal with a less serious disregard of statutory requirements and of the public purposes behind them. The appellants seek so to elevate the importance of statutes dealing with United States currency as to make the claimed infringement which they here perceive serious enough to invalidate *in toto* any resulting court decree or judgment. In particular they cite 31 U.S.C. § 463 which reads:

§ 463. Provision for payment of obligations in gold prohibited; uniformity in value of coins and currencies

(a) Every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

(b) As used in this section, the term "obligation" means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term "coin or currency" means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations.

Defendants cite in support of their contentions *Guaranty Trust Co. v. Henwood,* 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266 (1939). *Henwood* upheld legislation enacted as part of the comprehensive remedies adopted to overcome the stagnation of the depression. The legislation was intended to free the economy from the effects of loan agreements designed to permit some transactions to be conducted on the gold standard or its substantial equivalent while the welfare of the country dictated that its currency be no longer tied to gold. In *Henwood* the bonds issued in 1912 of a railroad stated that they were payable in United States dollars or, at the option of the holder, in currency of a number of other countries (English pounds, Dutch guilders, French francs, or German marks). If one

or more of the alternate currencies had remained on the gold standard, the holder, if he could enforce the clause, would receive more than the stated worth of the obligation in dollars; yet as the document was drafted he could never receive less than the face amount in dollars. His was a classic case of "Heads I win, tails you lose."

The objective of the statute and of the *Henwood* decision manifestly is not frustrated in the instant case. The contract which the consent judgment of January 27, 1976 represented called solely and exclusively for payment in francs. While the Swiss have a long-held and deserved reputation for prudence in money matters, there was nothing in law or in experience to guarantee that the dollar inevitably would be devalued as against the Swiss franc rather than the other way round. Indeed, in these days of extremely high interest rates, there are constant fluctuations and sometimes the dollar rises as against the franc and sometimes it declines. *See Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 519, 47 S.Ct. 166, 167, 71 L.Ed. 383 (1926) ("An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it"). The events ultimately produced a situation in which $.3875 would no longer buy a franc and $.625 was required. Yet, had the fiscal policies of the countries involved been otherwise, it might have gone the other way.[6] Thus, unlike *Henwood*, there was not a situation in which payment had to be in United States dollars at their value at time of payment or in some other amount which, as a practical certainty, had to be greater in value.

On the contrary, there was no provision, under the consent judgment, for payment in United States dollars at all. It was cast solely in francs. Payment could work, and in fact has worked, out to more than if the obligations had been expressed in United States dollars. However, the opposite could have occurred, so that payments in Swiss francs could have been less than they would have been had the medium of the agreement been United States dollars. In short, the transaction, as constructed, was a two-way street, though in fact travel turned out to be all in one direction. In *Henwood*, the street was one-way, and there was no possibility of going more than one direction.[7]

▪ The language of 31 U.S.C. § 463 declares a transaction to be against public policy which created a right in the obligee to require payment (a) in gold, (b) in a particular kind of coin or currency (specifically defined in the statute as meaning "coin or currency of the United States"), or (c) an amount of money of the United States measured thereby. It is indisputable that the consent judgment did not call for payment in gold; nor in United States coin or currency, nor in money of the United States, however measured. The appellants made the required periodic payments in the amounts of United States dollars which, at the time of payment, would purchase the requisite number of Swiss francs. Baeumlin & Ernst, Ltd. accepted the payments in dollars, presumably since it could immediately convert, and, therefore, there was no

---

**6.** Recent fluctuations have brought the price of a Swiss franc down from $.625 to $.5720.

**7.** *Henwood* essentially acknowledges that an obligation expressed solely in a foreign currency is not invalidated or rendered ineffective by 31 U.S.C. § 463. The dissent states that such was the case. 307 U.S. at 261, 59 S.Ct. at 854. The majority, faced with the contention that the obligation with which it was dealing was really five separate and distinct obligations, one of which was stated solely in Dutch guilders, to all effects and purposes acknowledged that, were that the case, the result would have been otherwise. The Court did not contend that a single obligation stated in guilders would violate the act. Instead it took the position that "these promises in alternative currencies were not separate and independent contracts or obligations, but were parts of one and the same monetary obligation of the debtor." 307 U.S. at 255–56, 59 S.Ct. at 851–52. The evils, which a result contrary to *Henwood* would have permitted, are simply not present in the case of the consent judgment with which we are concerned. Those evils were the assurance of payment in "a frozen money value", *id.* at 252, 59 S.Ct. at 850, and the equivalent of "the withdrawal and hoarding of gold" and "legal loopholes." *Id.* at 257, 59 S.Ct. at 852.

disadvantage in doing so. However, the fact remains that appellants consented to payment in Swiss francs.

The statute, 31 U.S.C. § 463, makes even clearer, if necessary, that so presentable a trading transaction as that with which we are concerned is not prohibited by legislative terms. Among the definitions in 31 U.S.C. § 463 is one for the term "obligation" as meaning an obligation "payable in money of the United States."[8] The obligations created by the consent judgment of January 27, 1976 were payable exclusively in Swiss francs; the statute, therefore, had no application and, consequently, could not render the consent judgment void.

Accordingly, we have no occasion to address the question of whether, if there were a contravention of 31 U.S.C. § 463, it would render the consent judgment void, or merely erroneous.[9]

■ To endeavor to remedy the fatal defect in the appellants' case stemming from the fact that the obligation was expressed exclusively in Swiss francs and not at all in dollars, they urge that the original obligations, the payments due under each confir-

mation order, were expressed in dollars. They argue that once so expressed the agreement took on a United States money character which could not be shed by a subsequent agreement expressed exclusively in Swiss francs. Conceivably, such an argument, if it had merit, could lead us into a tangled area. The standard order confirmation form employed by Baeumlin & Ernst, Ltd. states:

1. Prices

a) With reservation for an agreement to the contrary, the prices are on the basis of free carriage at the customary freight tariff for the Swiss valley rail station or Swiss border station and are understood to be in Swiss francs per kilo.

b) New tolls or toll increases or other taxes entering into force after the giving of an order. Increase in railroad freights, a change in the gold coin parity of the land concerned, insofar as the sale has taken place in foreign currency, and all other circumstances where a delivery, in any fashion directly or indirectly is made more expensive, are at the burden of the buyer.[10]

---

**8.** In *Henwood*, 307 U.S. at 253, 59 S.Ct. at 851, it is stated: "The obligations hit at by Congress were those 'payable in money of the United States.'"

**9.** There is no reason to consider if, when December 31, 1980 arrives, should appellants default on the final installment payment, whether, *on the application of Baumlin & Ernst, Ltd.*, there should be a modification of the judgment to express the obligation of sfr. 65,121.12 in terms of "the number of dollars equal on December 31, 1980 to sfr. 65,121.12." Such an amendment might be necessary in light of 31 U.S.C. § 371's requirement that the money of account of the United States be "expressed in dollars" and the related requirement that "all proceedings in the courts shall be kept and had in conformity to this regulation." *See International Silk Guild, Inc. v. Rogers*, 262 F.2d 219, 224 (D.C.Cir.1958) ("... for American courts are permitted to render judgments only in dollars"); *Shaw, Savill, Albion & Co., Ltd. v. The Fredericksburg*, 189 F.2d 952, 954 (2d Cir. 1951) ("It is well settled that a money judgment by an American court must be in American

currency."). However, the very default which would cause the question to arise would cause the obligation to increase from sfr. 65,121.12 to sfr. 308,583.22. Hence, it is extremely unlikely to occur.

In all events, such a need for *modification* would not signify that the judgment was entirely *void*.

**10.** 1. Preise

a) Vorbehaltlich anderslautender Vereinbarung gelten die Preise franko gewoehnliche Fracht schweizerische Talbahnstation oder schweizerische Grenzstation und verstehen sich in Schweizer Franken per Kilo.

b) Nach Auftragserteilung neu in Kraft tretende Zoelle oder Zollerhohungen oder andere Abgaben. Erhohung der Eisenbahnfrachten, Aenderung in der Goldmuenzparitaet des betroffenden Landes, sofern der Verkauf in fremder Waehrung erfolgte, und alle sonstigen Umstaende, wodurch eine Lieferung in irgendeiner Form mittelbar oder unmittelbar verteuert wird, gehen zu Lasten des Kaeufers.

The record does not contain any order confirmation actually employed but rather shows the standard blank form and then shows in a combining exhibit the amounts of each transaction expressed in United States dollars. We are, however, left to speculate whether the confirmation orders were expressed in Swiss francs with dollar equivalents calculated or whether the confirmation orders showed prices in American dollars. Where the transaction was viewed as an essentially current one (payment on each order was due in ninety days), the parties may not have concentrated any attention on the possibility of currency fluctuations.

Further, say appellants, even assuming that the confirmation orders spoke in Swiss francs, nevertheless, by stipulation, the parties agreed on January 26, 1976 that "Gemini, Ltd. is indebted to Baumlin & Ernst Ltd. in the sum of $144,249.89." However, the stipulation was entered in contemplation of a trial in a court of the United States which, upon completion, since there would be no agreement of the parties to employ Swiss francs as the currency medium, would lead to the entry of a customary judgment, not of a consent judgment entered at the behest of all parties. Such a customary judgment would have had to have been stated in United States dollars.[11]

Hence, there was no possibility, at the time the stipulation was entered, for it to be couched in any currency but United States dollars. Correspondingly, of course, the obligation to which the stipulation was,

in fact, addressed was an altogether current one to be collectible immediately, and immediately convertible into Swiss francs, without the heightened risks of devaluation inherent in any plan for satisfaction on an extended installment payment plan.

When settlement was finally hammered out, it was with the essential differentiating condition present, namely, staged payment over a period in excess of four years. Entering the picture contemporaneously with the installment payment plan was the substantial risk of fluctuation in currency values. Thus, regardless of whether the original confirmation orders were in dollars, and acknowledging that the stipulation expressed itself in United States currency, nevertheless, the consent judgment of January 27, 1976 amounted to an entirely new agreement not subordinate to anything that had gone before. It is stated exclusively in terms of payment in Swiss francs and does not in any way qualify as an obligation payable in money of the United States. It, therefore, is irrelevant whether the original confirmation orders or the subsequent stipulation of January 26, 1976 are obligations payable in money of the United States.[12] The agreement to which our attention is solely drawn is the consent judgment of January 27, 1976.

■ Appellants' argument that it is no longer equitable that the consent judgment of January 27, 1976 should have prospective application, and so the relief provisions of Fed.R.Civ.P. 60(b)(5) should apply,[13] need

11. *See* footnote 9 *supra.*

12. We are not here confronted with any suggestion that the provision in the consent judgment for the currency to be Swiss francs was in any way a subterfuge to avoid the application of 31 U.S.C. § 463. Counsel for appellants was candid enough to acknowledge during oral argument that no thought was given as to the possible applicability of that statute in the course of working out the terms of the consent judgment. *See also* Reply Brief for Appellants, p. 3.

13. We have assumed that there is prospective application, insofar as the December 31, 1980

final installment is concerned. We have also assumed that the December 31, 1979, payment, though it has been made, because of fear of the penalties for default (acceleration and an increase in the total amount due), is invested with "prospective application" characteristics since it was not due or paid when suit was filed on August 1, 1979. In fact, however, they may not have prospective application insofar as Fed.R.Civ.P. 60(b)(5) is concerned. *See Marshall v. Board of Education, Bergenfield, New Jersey,* 575 F.2d 417, 425 (3d Cir. 1978); *but see Bros Inc. v. W. E. Grace Mfg. Co.,* 320 F.2d 594, 610 (5th Cir. 1963).

not long detain us. The district court found that there was no equity favoring appellants.[14] Such a determination as to the equities should not be disturbed by us, absent an abuse of discretion by the district court. *Safe Flight Instrument Corp. v. United Control Corp.*, 576 F.2d 1340, 1343 (9th Cir. 1978). *Cf. United States Fidelity and Guaranty Co. v. Lawrenson*, 334 F.2d 464, 466 (4th Cir. 1964), *cert. denied*, 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964). We perceive no abuse of discretion, for the bargain by which appellants obtained a spreading out of the period in which to make payment in return for assuming the risks (including the possible benefits) of currency fluctuations was fair and equitable.

For the same reason there is nothing to justify invocation of the catch-all language of Fed.R.Civ.P. 60(b)(6) ("any other reason justifying relief from the operation of the judgment"). Judge McMillan's opinion cogently establishes why the consent judgment was fair and equitable and has remained so, and no other convincing reason justifying relief has been suggested.

Accordingly, the judgment is affirmed.

*AFFIRMED.*

14. "In the present case it would be *unjust* and highly *inequitable* to shift the bargained risk of inflation from the defendants who assumed it to the plaintiff who insisted that defendants assume it—and who agreed to accept less in settlement because the payments were to be made in francs."